Citation Nr: 1602940 
Decision Date: 01/29/16 Archive Date: 02/05/16

DOCKET NO. 08-00 048A ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Cleveland, Ohio


THE ISSUE

Entitlement to compensation under 38 U.S.C.A. § 1151 for residuals of a stroke other than right upper extremity weakness and numbness, and mild speech dysfluency, dysarthria, and stuttering. 


REPRESENTATION

Appellant represented by: Daniel G. Krasnegor, Attorney at Law


WITNESS AT HEARING ON APPEAL

The Veteran


ATTORNEY FOR THE BOARD

L. Barstow, Counsel
INTRODUCTION

The Veteran had active military service from April 1981 to June 1984. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a May 2007 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Cleveland, Ohio. 

In February 2009, the Veteran testified at a hearing before the undersigned. A transcript of the hearing has been associated with the claims file. 

A Board decision in August 2011 granted compensation under 38 U.S.C.A. § 1151 for residuals of a stroke, including right upper extremity numbness and weakness. The Veteran thereafter appealed the Board's decision to the United States Court of Appeals for Veterans Claims (Court) insofar as he disagreed with the residuals granted. In an Order dated in January 2013, the Court granted a Joint Motion for Partial Remand (JMPR) by the Veteran and VA General Counsel, which was incorporated by reference, to vacate the Board's decision only so far as it failed to adjudicate a claim for residuals other than right upper extremity numbness and weakness and remand the case for readjudication in accordance with the JMR.

The case was subsequently remanded in January 2014 in accordance with the JMR to obtain additional treatment records and afford the Veteran VA examinations to determine the residuals of his stroke. Review of the record indicates substantial compliance. See Stegall v. West, 11 Vet. App. 268, 271 (1998).

In a September 2015 statement, the Veteran's representative asserted that he was entitled to compensation for loss of fine coordinated movements on his right side. As the Veteran is currently receiving compensation for right upper extremity weakness, the Board construes this statement as a claim for an increased rating. Furthermore, the statement also raises the issue of entitlement to a total rating based on individual employability due to service-connected disability (TDIU). As such, the issues of an increased rating for right upper extremity weakness and entitlement to a TDIU have been raised by the record, but have not been adjudicated by the Agency of Original Jurisdiction (AOJ). Therefore, the Board does not have jurisdiction over them, and they are referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2015).


FINDING OF FACT

In addition to the already compensated residuals of right upper extremity weakness and numbness, and mild speech dysfluency, dysarthria, and stuttering, the Veteran also incurred central visual field defects as additional disability as residuals of a stroke.


CONCLUSIONS OF LAW

1. The criteria for an award of compensation pursuant to 38 U.S.C.A. § 1151 for central visual field defects as residuals of a stroke have been met. 38 U.S.C.A. § 1151 (West 2014); 38 C.F.R. § 3.361 (2015).

2. The criteria for an award of compensation pursuant to 38 U.S.C.A. § 1151 for residuals of a stroke other than visual field defects, right upper extremity weakness and numbness, and mild speech dysfluency, dysarthria, and stuttering, have not been met. 38 U.S.C.A. § 1151 (West 2014); 38 C.F.R. § 3.361 (2015).


REASONS AND BASES FOR FINDING AND CONCLUSIONS

I. VA's Duties to Notify and Assist

The VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159 & 3.326(a) (2015). Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant and his representative of any information, and any medical or lay evidence, that is necessary to substantiate the claim. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b); Quartuccio v. Principi, 16 Vet. App. 183 (2002). The notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. Such notice should be provided to a claimant before the initial unfavorable agency of original jurisdiction (AOJ) decision on a claim. Pelegrini v. Principi, 18 Vet. App. 112 (2004). 

The Veteran was notified in a letter dated in October 2006 regarding the type of evidence necessary to establish his claim. He was instructed how to establish entitlement to compensation under 38 U.S.C.A. § 1151. The Veteran was notified of what evidence and/or information was already in the RO's possession, what additional evidence and/or information was needed from the Veteran, what evidence VA was responsible for getting, and what information VA would assist in obtaining on the Veteran's behalf. The letter notified the Veteran of the criteria for assigning a disability rating and an effective date. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). 

Regarding VA's duty to assist, VA obtained the Veteran's post-service medical records and also secured examinations in furtherance of his claim. Pertinent VA examinations were obtained in September 2014 and June 2015. 38 C.F.R. § 3.159(c)(4). The VA examinations obtained in this case are sufficient, as the examiners conducted a complete examination, recorded all findings considered relevant under the applicable law and regulations, and offered well-supported opinions based on consideration of the full history of the disorders. Although in a September 2015 statement, the Veteran's representative asserted that the September 2014 examinations were not adequate as the examiners did not review the claims file as directed by the Board in its January 2014 remand, addendums to the examinations dated in October 2014 show that the claims file had been reviewed and the examination findings were unchanged. The Board finds that VA's duty to assist the Veteran with respect to obtaining a VA examination concerning the issue adjudicated herein has been met. 38 C.F.R. § 3.159(c)(4). 


II. Analysis

As discussed in the Introduction, a Board decision in August 2011 granted compensation under 38 U.S.C.A. § 1151 for residuals of a stroke, including right upper extremity numbness and weakness. The January 2013 JMPR only vacated the Board's decision to the extent that it did not explicitly grant compensation under 38 U.S.C.A. § 1151 for residuals of a stroke other than right upper extremity weakness and numbness. The favorable determination that compensation under 38 U.S.C.A. § 1151 for residuals of a stroke was not vacated as the Court is statutorily prohibited from reversing the Board's favorable findings under 38 U.S.C.A. § 7261 (a)(4) (West 2014).

Consequently, this decision will focus not on the threshold determination of whether the Veteran is entitled to compensation under 38 U.S.C.A. § 1151 for residuals of a stroke, but rather on what residuals he actually incurred. As a rating decision in March 2015 granted compensation for right upper extremity weakness and mild speech dysfluency, dysarthria, and stuttering, the Board will be focusing on what other residuals the Veteran incurred as a result of his stroke.

To determine whether the veteran has additional disability, VA compares the veteran's condition immediately before the beginning of the hospital care, medical or surgical treatment, examination, training and rehabilitation services, or compensated work therapy (CWT) program upon which the claim is based to the veteran's condition after such care, treatment, examination, services, or program has stopped. VA considers each involved body part or system separately. 38 C.F.R. § 3.361(b) (2015).

Records dating back to 1987 show that the Veteran had vision complaints with a diagnosis of Stargardt's macular degeneration. A July 1987 record shows that the Veteran had sight loss and that he understood that he might lose more vision. At a VA examination in April 1990, the Veteran was diagnosed with Stargardt's disease in both eyes and legal blindness in both eyes. 

An April 2005 record shows that the Veteran had a history of bipolar disorder. The Veteran had a stroke in July 2005. The July 2005 discharge summary following the Veteran's hospitalization for his stroke reveals that it was noted that the Veteran was legally blind secondary to macular degeneration. The Veteran was reported to be able to read though, with glasses, but did have some peripheral vision loss bilaterally. 

A record dated in August 2006 reveals that the Veteran reported that he went blind in both eyes when he had his stroke. A January 2007 record shows that the Veteran's mother related that since his stroke, the Veteran had had changes in speech and pain in his shoulder and arm. She did not mention any other changes. The Veteran was again noted to be legally blind secondary to Stargardt's in April 2007. 

The Veteran was provided a neuropsychological evaluation in May 2008. Results of testing were opined to suggest relatively subtle and circumscribed impairment in working memory with a backdrop of generally spared functions and no indication at all of dementia. It was noted that the Veteran's performance exhibited mild slowing of visuographic processing speed; however, given his limited sight, his performance was likely negatively impacted by the visuospatial requirements of that task. It was noted that the Veteran performed without impairment on a verbal analogue of a task requiring him to hold and repeat random numbers and letters in the working memory buffer in order to rearrange them into an alphanumeric sequence. It was further noted that the Veteran had no difficulty in his ability to repeat random numbers in a forward and backward sequence. The Veteran was noted to have no difficulty on a task of focused attention in the presence of distraction. His performance was reported to be mildly impaired when required to shift attention to another task. It was noted that the Veteran's difficulty with working memory did not interfere with his performance on tasks of secondary verbal memory, which were globally intact. 

The Veteran's performance on dementia sensitive language measures was also intact. The evaluator also noted that the Veteran's functions subserved by the frontal area of the brain, i.e., executive functions on non-routine problem solving, planning, and organization were spared. The evaluator concluded that the overall pattern of neurocognitive test results suggested relatively subtle and circumscribed impairments in working memory within a backdrop of generally spared functions.

An August 2009 record reveals that the Veteran reported that although he was blind in the center, his peripheral vision would disappear and fade back in. He reported that he "didn't have this problem at all until I started taking the viagra, but this would happen when I didn't take it." 

A December 2011 statement from the Veteran shows that he reported that his residuals of the stroke included problems with his right arm, right shoulder, and right hand; vision problems; and speech problems. He reported that although he was legally blind prior to the stroke, his blindness stemmed from loss of central vision and that he still had peripheral vision. He reported that after his stroke, he suffered total blindness and that currently, his vision still went in and out. He did not mention any psychiatric problems. 

Records dated in January 2012 show that the Veteran was diagnosed with history of bipolar disorder and that he had had urinary incontinence for the past two years, but no stool incontinence. Another record shows that the Veteran had had visual changes consisting of "blacking out" and a "bright light in the corner" for about two years with increasing frequency. The record reveals that that had been worked up in the past and was thought to be due to his Stargardt's disease. Another January 2012 record shows that the Veteran was diagnosed with manic psychosis secondary to corticosteroids versus bipolar disorder, manic. A record dated in October 2012 shows that the Veteran denied any dysfunction of bowel or bladder. A September 2013 record shows that the Veteran presented with urinary frequency; he was diagnosed with benign prostate hypertrophy.

A December 2013 symptom questionnaire from the Veteran reveals that his reported symptoms included the inability to control bladder and/or bowel movement; loss of vision; blurred vision; loss of speech; blurred speech; paralysis; pain in his right shoulder, arm, and hand; and problems with long or short term memory. 
An August 2014 record reveals that the Veteran had no bowel or bladder incontinence.

The Veteran was afforded VA examinations in September 2014. At the central nervous system examination, the Veteran reported that when the stroke began in 2005, his right upper extremity fell totally asleep. He reported that the right leg was not affected. The Veteran reported that his speech was also affected. He said that he did not have good manipulative strength. He described that a shade would come down on the eye and sometimes vision would be completely out. His vision now was reported to come and go sometimes. He reported that there was always pain in the right arm from the shoulder radiating down to the fourth and fifth digits.

The Veteran reported symptoms of muscle weakness in the upper and/or lower extremities. He denied symptoms of pharynx and/or larynx and/or swallowing conditions; respiratory conditions; sleep disturbances; voiding dysfunction causing urine leakage, signs and/or symptoms of urinary frequency; voiding dysfunction causing signs and/or symptoms of obstructive voiding; voiding dysfunction requiring the use on an appliance; history of recurrent symptomatic urinary tract infections; and erectile dysfunction. He had mild abnormal speech. His gait was abnormal due to pain in the right leg, which existed prior to the stroke, and pain in the left leg, unrelated to the stroke. The examiner reported that the Veteran did not have any other pertinent physical findings, complications, conditions, signs, or symptoms related to his condition. The examiner also reported that the Veteran had depression, cognitive impairment, or dementia attributable to a central nervous system disease and/or its treatment. 

The examiner opined that the Veteran's reduced strength in his right upper extremity as well as speech impairments and inability to do fine coordinated movements on the right side were entirely due to the stroke suffered in 2005. The examiner also opined that the Veteran's ocular manifestations or poor visual ability to distinguish things all the time with blanking in and out vision was more likely than not due in some measure to the parietal-occipital watershed infarcts, though they could not determine a specific percentage involvement without resorting to speculation. The examiner remarked that the Veteran continued to suffer from chronic left middle cerebral artery territory deficits, to include mild to moderate weakness in the right upper extremity, dysarthric and dysfluent as well as occasionally stuttering speech. The examiner continued that there were visual field defects, which were more likely than not central in nature, which had to do more with processing associated areas in Brodmann's cortical regions as affected by the watershed infarct on the left. The examiner noted that the Veteran still reported occasional "shades" coming down as those could possibly be either Hollenhorst plaques traversing the retinal artery or transient decompensation of the parieto-occipital territory as described elsewhere due to the effects of chronic stroke.

The Veteran was also provided an eye conditions examination. He was diagnosed with Stargardt's maculopathy and cataracts. The examiner noted that a review of the Veteran's records showed a longstanding history of reduced visual acuity secondary to bilateral Stargardt's maculopathy, dating back to at least 1986. The examiner noted that the Veteran was legally blind as secondary to that condition. The examiner opined that the reduced visual acuity of the right and left eyes shown in the examination were attributable to Stargardt's maculopathy and not the cataracts. The examiner explained that Stargardt's was a congenital form of macular degeneration. The examiner opined that it was not attributable to the stroke of July 2005; in fact, the Stargardt's appeared to have preceded the stroke by approximately twenty years. The examiner opined that the Stargardt's maculopathy was the etiology of the reduced acuity (including the legal blindness status). The examiner also opined that the Veteran's nuclear sclerosis was most commonly an idiopathic aging process. The examiner opined that it was not attributable to the stroke. The examiner opined that there were no significant visual deficits notes attributable to that condition. The examiner also opined that visual field (i.e. side vision) deficits were a common complication of strokes. The examiner opined that, unfortunately, the Veteran's severely decreased central vision made testing the peripheral vision difficult and unreliable, at best. The examiner reported that no bilateral visual field deficits (which would be the expected visual field deficit corresponding to a stroke) were noted via screening testing as part of that examination.

The Veteran was also afforded a psychiatric VA examination in June 2015. He was diagnosed with unspecified depressive disorder, cannabis use disorder, and cannabis intoxication. The examiner reported reviewing the 2008 neuropsychological evaluation as well his psychiatric treatment in January 2012. The examiner also discussed other records showing a pain disorder in 2013 and chronic pain in 2014. The examiner opined that it was not possible without resort to mere speculation to determine whether the Veteran had mental health manifestations of his stroke; such an opinion was outside the scope of a medical professional conversant with VA practices. The rationale was that the Veteran had used marijuana on the day of the exam and was more likely than not intoxicated at the time of the clinical interview. The examiner reported that nearly every diagnosis in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) was ruled out unless the symptoms were not attributable to the physiological effects of a substance, since substance intoxication affected the individual's immediate mood state. 

The examiner reported that the Veteran sobbed throughout the exam and attributed his immediate mood state to many events in his life, including physical child abuse, being kidnapped and sexually molested as a young teen, being robbed many times as a teen, being beaten by military superiors, chronic pain, incapacities due to both blindness and the stroke, being unable to drive due to blindness, and feeling that nobody presently wanted to help him. The examiner noted that despite his highly emotional state, he denied any current symptoms of depression, anxiety, or other mental disorders. The examiner opined that, in other words, his clinical presentation of great unhappiness was inconsistent with his self-report that he rarely felt depressed, did not feel worthless, and had not had any thoughts of suicide in a long time. 

The examiner opined that concerning the Veteran's complaints of memory loss following the stroke, the 2008 neuropsychological evaluation found "relatively subtle and circumscribed impairments in working memory within a backdrop of generally spared function." The examiner noted that due to his legal blindness, it was not possible to administer the tests used in 2008 to determine if there had been any subsequent improvement or deterioration in memory. The examiner concluded that therefore, it would require a resort to mere speculation to determine if there were any current cognitive impairments due to the 2005 stroke. 

None of the Veteran's treatment records have shown a diagnosis of a psychiatric or cognitive disorder as a residual of his stroke. They also have not shown that the Veteran has the inability to control bladder and/or bowel movement as a residual of his stroke.

Based on a review of the evidence, the Board concludes that in addition to the already compensated for residuals of right upper extremity weakness and numbness and mild speech dysfluency, dysarthria, and stuttering, when affording him the benefit-of-the-doubt, the Veteran also has central visual field defects attributable to his stroke. However, no other residuals have been shown.

In this case, although the Veteran has Stargardt's disease, long preceding his 2005 stroke, the 2014 central nervous system examiner's opinion indicates that the Veteran has central visual field defects as a residual of his stroke. The Veteran's reports of increasing vision problems after his stroke are consistent with the examiner's opinion. In finding that the Veteran has visual field defects as a residual, the Board acknowledges the opinion of the eye conditions examiner. However, as both examiner's opinions were formed after interviewing and examining the Veteran, the Board accords them equal probative value. As such, the evidence for and against central visual field defects as a stroke residual is in approximate balance. When affording the Veteran the benefit-of-the-doubt, the Board concludes that the Veteran has central visual field defects as a residual of his stroke.

However, the evidence does not show other residuals. Although the Veteran reported having urinary and/or bowel problems, the medical evidence of record fails to show such attributable to his stroke. As noted above, while some of his treatment records show urinary frequency and incontinence, no medical professional has provided any opinion relating those problems to his stroke. Rather, the Veteran's treatment records show a diagnosis of benign prostate hypertrophy. Moreover, the comprehensive September 2014 central nervous system examination specifically shows that the Veteran did not have any urinary symptoms attributable to his stroke. Consequently, the Board concludes that the Veteran does not have urinary and/or bowel problems that are a residual of his 2005 stroke.

The evidence also does not show a psychiatric or cognitive residual. While the September 2014 central nervous system examination report shows that the Veteran had depression, cognitive impairment, or dementia attributable to a central nervous system disease and/or its treatment, in their remarks section, the examiner did not actually identify a psychiatric or cognitive disorder as being a residual. The examiner specifically discussed the Veteran's right upper extremity, speech, and visual impairments, but did not identify psychiatric and/or cognitive residuals. 

Contrary to that examination report, the June 2015 VA psychiatric examiner opined that it was not possible without resort to mere speculation to determine whether the Veteran had mental health manifestations of his stroke. The examiner reported that such an opinion was outside the scope of a medical professional conversant with VA practices. As noted above, the 2008 neuropsychological evaluation suggested only relatively subtle and circumscribed impairment in working memory with a backdrop of generally spared functions and no indication at all of dementia. Although some of the Veteran's treatment records show a diagnosis of bipolar disorder, there is no opinion relating that as a residual of his stroke. In fact, a record in 2005 prior to the 2007 stroke noted a history of bipolar disorder. Furthermore, the Veteran's mother's statement to the Veteran's treatment provider in 2007, as well as the Veteran's 2011 statement, both fail to show psychiatric and/or cognitive impairment as a result of his stroke. 

As the 2015 examiner's opinion provided a rationale for why an opinion relating a psychiatric or cognitive disorder to the Veteran's stroke could not be provided without resorting to mere speculation, the Board finds that it is adequate. See Jones v. Shinseki, 23 Vet. App. 382 (2010) (holding that an examiner's report that he or she cannot provide an opinion without resorting to speculation is inadequate unless the examiner provides a rationale for that statement). In this case, the Board accords more probative value to the 2015 psychiatric examiner's opinion, provided by a psychologist, than to the 2014 central nervous system examiner's opinion of psychiatric symptoms attributable to the stroke, provided by a neurologist. The 2015 examiner discussed the 2008 testing as well as the Veteran's other pertinent treatment records. Considering the thoroughness of 2015 psychiatric examination specifically provided by a psychologist as opposed to a neurologist, the 2008 testing results, and the Veteran's mothers and his statements in 2007 and 2011, the evidence does not support a finding that the Veteran has identifiable psychiatric and/or cognitive residuals for which compensation can be granted as a result of his 2007 stroke. 

Although lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435(2011), as to the specific issue in this case, the diagnosis and etiology of claimed stroke residuals other than the central visual field deficits, right upper extremity weakness and numbness, and mild speech dysfluency, dysarthria, and stuttering falls outside the realm of common knowledge of a lay person. See Jandreau at 1377 n.4 (lay persons not competent to diagnose cancer). The Veteran's own assertions as to diagnosis and etiology have no probative value.

Therefore, for the reasons set forth above, the evidence supports a finding of central visual field deficits as a residual of the Veteran's stroke. However, without evidence of other residuals associated with the Veteran's stroke, compensation under 38 U.S.C.A. § 1151 for residuals other than the central visual field deficits, right upper extremity weakness and numbness, and mild speech dysfluency, dysarthria, and stuttering is not warranted. Based on this evidentiary posture, the Board concludes that the while the evidence is for the claim of central visual field deficits, the preponderance of the evidence is against the Veteran's claim for compensation under 38 U.S.C.A. § 1151 for other residuals of his stroke. As the preponderance of the evidence is against this issue, the benefit-of-the-doubt rule does not apply, and the Veteran's claim of entitlement to compensation under 38 U.S.C.A. § 1151 for residuals of a stroke other than central visual field deficits, right upper extremity weakness and numbness, and mild speech dysfluency, dysarthria, and stuttering is denied. See 38 U.S.C.A §5107 (West 2014).



ORDER

Entitlement to compensation under 38 U.S.C.A. § 1151 for additional disability in the form of residuals of a stroke, including central visual field deficits, in connection with an undiagnosed stroke at a VA facility is granted.

Entitlement to compensation under 38 U.S.C.A. § 1151 for additional disability in the form of residuals of a stroke other than central visual field deficits, right upper extremity weakness and numbness, and mild speech dysfluency, dysarthria, and stuttering in connection with an undiagnosed stroke at a VA facility is denied.



____________________________________________
MILO H. HAWLEY 
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs